UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JOHN PURCELL,

                Plaintiff,                    Docket No.: 16-CV-3555(JMA)(AKT)

   -against-                              **AMENDED COMPLAINT**

NEW YORK INSTITUTE OF TECHNOLOGY-
COLLEGE OF OSTEOPATHIC MEDICINE,

                Defendant,
----------------------------------------------------------X

The Plaintiff, JOHN PURCELL, by his attorney, STEWART LEE KARLIN, complaining of Defendant, NEW YORK INSTITUTE OF TECHNOLOGY- COLLEGE OF OSTEOPATHIC MEDICINE, alleges upon knowledge as to himself and his own actions and upon information and belief as to all other matter, as follows:

## NATURE OF THE CLAIM

1. This is a civil action based upon Defendant's violations of in violation of the Americans with Disabilities Act, 42 U.S.C. § 12182 by discriminating against Plaintiff due to his disability and perceived disability and in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX") by discriminating against Plaintiff because of his gender (sexual preference) and retaliating against him for his complaints of discrimination. This action is also based upon Defendant's violation of the New York State Executive Law for the same. Plaintiff is seeking damages for violating his civil rights.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over Defendant NEW YORK INSTITUTE OF TECHNOLOGY- COLLEGE OF OSTEOPATHIC MEDICINE  pursuant to 29 U.S.C. § 2617 and 42 U.S.C

§ 12117. Plaintiff has commenced this action pursuant to the ADA, Title IX and the New York State Human Rights Law.

3. This action properly lies in the County of Richmond, as Plaintiff's place of residence.

## PARTIES

4. At all times hereinafter mentioned, Plaintiff JOHN PURCELL ("Plaintiff" or "Mr. Purcell"), was and still is a resident of the State of New York, County of Richmond. Plaintiff at all relevant times was a student of the Defendant NYIT-College of Osteopathic Medicine. ("NYIT"). The plaintiff has a disability and perceived disability (ADHD and anxiety) that impacted major life activities and he participated in protected activity pursuant to the ADA. Plaintiff had a physical and mental impairment that substantially limits one or more major life activities, had a record of such an impairment and was regarded as having such an impairment.

5. Defendant New York Institute of Technology- College of Osteopathic Medicine is duly organized and existing by virtue of the laws of the State of New York and upon information and belief is a non-profit corporation and conducts a significant amount of business in the State of New York.

6. At the time of his enrollment, Plaintiff was provided by Defendant with Defendant's policies regarding academic criteria for graduation and the EEO policies from the school, as well as the appeal procedures in the event of an alleged breach of the agreement. This formed the contract between the Plaintiff and Defendant. The contract was based on the terms and conditions for graduation that were offered by the Defendant at the time of Plaintiff's enrollment. Implicit in the contract, is to apply the rules uniformly and not to act

1

discriminatorily when applying the policies to a given situation.

7. Defendant by and through its agents breached the contract in the State of New York, and also violated federal and state anti-discrimination laws hereinafter more specifically described.

## STATEMENT OF THE FACTS

8. Plaintiff enrolled in the NYIT College of Osteopathic Medicine in 2009 as a medical student.

9. Plaintiff suffered from a disability and perceived disability (ADHD and Anxiety) that impacted major life activities including symptoms of chronic fatigue, headaches, insomnia, diminished sex drive, and memory, but in no way impairs his ability to execute his duties and responsibilities as a medical student and to complete the requirements necessary for graduation.

10. Defendants were aware of Plaintiff's disability as he disclosed it to a Dean in his 2nd year of Medical School. This Dean informed other Deans at NYIT.

11. Additionally, Plaintiff's primary care physician, who diagnosed Plaintiff's ADHD and Anxiety, practiced in the Student Medical Center at NYIT and was also a professor at the School.

12. Plaintiff's disabilities were common knowledge among the faculty at NYIT.

**Second Year of Medical School**

13. During Plaintiff's second year at NYIT he began receiving incessant phone calls and Facebook messages in September 2010, which after a few weeks became distracting and unnerving, as they occurred at all hours of the day and night, and were received from different phone numbers and profile names. Plaintiff believed that they were coming from an individual who he had recently ended a relationship with, but could not be sure at the

      time.

14. On October 22, 2010 Plaintiff arrived at NYIT (Institute for Clinical Competency) to take a practical exam in cardio/pulmonary medicine. However, he was extremely anxious as a result of the "stalking" situation which had been occurring and also the previous week spent studying. Instead of beginning the examination, Plaintiff decided to seek the help of Claire Bryant, Ph. D, a pre-clinical Dean at NYIT, and explained the situation to her. Dean Bryant suggested that he speak with other faculty, and brought Plaintiff to the office of Cheryl Newman, where Plaintiff also met Dean Abraham Jeger, Dean Felicia Bruno and Dean Mary Ann Achtzinger for the first time. Plaintiff, discussed his grades and personal situation with them. Once Plaintiff began describing the situation, Dean Jeger began interviewing Plaintiff from a psychological standpoint, including asking mini mental status type questions, focused schizophrenic questions, psychiatric questions and questions about Plaintiff's medical history. With all of these Deans present for the questioning, Plaintiff became embarrassed and upset and began crying. Plaintiff explained to them that he understood their concern but that he was not experiencing hallucinations or delusions regarding the "stalking" situation and that his roommates and friends had also witnessed it. The deans insisted that Plaintiff see his primary care physician, Dr. Carlos Maghaeles at the academic health center on campus.

15. The Deans also suggested that Plaintiff schedule an appointment with Cheryl Newman, as soon as possible, which Plaintiff did the following week.

16. Plaintiff informed them that his psychiatrist was already aware of the situation and Plaintiff was being counseled.

17. Plaintiff said that he would leave campus to regroup, and that he was able to drive home, however the Deans would not permit him to leave and they all walked him across campus to the academic health center.

18. The following week, Plaintiff was called to Dean Achtzinger's office to again discuss his health and security issues on campus with Defendant's security personnel. Dean Jeger and Dean Bruno were also present at the meeting, along with a campus security guard and the head of security for the campus. After the security personnel left the meeting, Plaintiff was again asked multiple questions about his personal life, medical history and medication.

19. At the conclusion of the meeting, Dean Jeger and Achtzinger asked to have Plaintiff's medical records released to them from Dr. Belkin. Plaintiff explained that he was not hiding anything from them and that he did not feel it was necessary to release his medical records to them at this time. He further expressed that he would like to consult with someone prior to signing any release. However, at this point, Mary Ann Achtinger told Plaintiff to wait, and she brought in a staff attorney of Defendant, and she continued to urge him to sign the release, which he could hand write as dictated by the staff attorney.

20. At a follow-up meeting Mary Ann Achtinger again urged Plaintiff to sign a medical release for Defendant.

21. In a conversation with Defendant's student life counselor/coordinator, Linda Daroch-Short, she commented to Plaintiff that many of the deans which he was dealing with had "old-school" and "religious" viewpoint which did not allow them to be comfortable with or understand Plaintiff's situation and sexual orientation (Gay).

22. In regards to the stalking situation, Plaintiff had Donna Denatale, a former NYPD sergeant,

4

investigate whether there were instances of repeated communications electronically and at Plaintiff's home, and Denatale was able to confirm such to Defendant to show that Plaintiff was not "delusional" or making up the allegations.

23. Plaintiff was informed by his roommate that she learned from faculty member Karen Sheflin, that Plaintiff was a frequent topic of conversation at staff meetings, including discussions about both his personal and academic life.

24. Plaintiff was also subjected to further discrimination based on his sexual preference in that he was sent x-rated pictures on a phone application (Grindr) by an employee of Defendant, Dr. William Blazey.

25. Additionally, Plaintiff was subjected to homophobic remarks during lectures given by Dean Scandalis, as well as other staff, throughout the 2nd year. In response, Plaintiff became instrumental in creating an LGBT club on campus, and during Plaintiff's third year he attended meetings at which he spoke about LGBT health issues and LGBT education for the faculty and staff because of the offensive and outdated comments/instruction that were being given in class.

26. Specifically, in clinical case studies prepared and utilized by the NYIT faculty, medical histories of patients included such diagnoses as "significant for homosexuality." Additionally, Plaintiff heard a professor use the terms, "pitcher and catcher" to describe gay men when lecturing to the class.

27. Upon information and belief the faculty were aware of Plaintiff's complaints of discriminatory comments, as multiple professors sat in on these meetings and retaliated against him as a result.

5

**Fourth Year of Medical School**

28. During Plaintiff's fourth and final year as a medical student he failed three clerkships, however two of those clerkships were determined to be defective as clerkships by the School.

29. The first of these defective clerkships was directly due to the lack of structure and substance caused by the attending physician, Dr. John Imperio. While Dr. Imperio is a respected physician and always professional to Plaintiff, he was operating his practice at a "semi-retired" level. Dr. Imperio had minimal recent experience as a preceptor and due to these factors he was unsuitable to supervise Plaintiff's clerkship. For example, Dr. Imperio was on vacation for two of the four weeks of the clerkship and could only instruct Plaintiff to "try to shadow other physicians," on days Dr. Imperio was not at the hospital.

30. Plaintiff was not aware of the these issues at the inception of his clerkship and once he began, he had no opportunity to remedy the unsuitability of Dr. Imperio to supervise him. Plaintiff would not have begun these clerkships with Dr. Imperio had he been aware of this.

31. Further, it must be noted that at the time Plaintiff chose his fourth year clerkships he was choosing between the paths of internal medicine and surgery, and thus Plaintiff was waiting to the end of the scheduling period to make his clerkship choices. Further complicating matters was Hurricane Sandy and the cancellation and rescheduling of rheumatology.

32. Dr. Goldstein, who had always claimed his interest and availability in resolving any issues related to clerkships, was particularly unhelpful and disinterested in assisting Plaintiff in scheduling his clerkships. Dr. Goldstein sarcastically told Plaintiff that he would never set foot in the NYU Medical Center as a physician.

33. Plaintiff received a failing grade in his third clerkship (Spring 2013), Trauma Surgery, as a

result of an attendance issue, which was exacerbated by the after-effects of Hurricane Sandy. Trauma Surgery is a sub-specialty, and surgery residents rotate frequently through the trauma surgery team, making it difficult for a student to stay with one particular resident for a set number of hours per week. Plaintiff again tried to address this scheduling situation with Dr. Goldstein but received no assistance, thus resulting in Plaintiff's failure of the third clerkship.

34. On May 5, 2013 Plaintiff walked at his graduation from NYIT.

35. It was not until, a week later, that Plaintiff was informed that he was scheduled for a disciplinary hearing on May 22, 2013 with the Student Discipline Review Board on May 22, 2013 based on an allegation that he violated the NYIT College of Osteopathic Medicine Code of Conduct for Academic Honesty.

36. By letter dated May 22, 2013, from Dean Wolfgang G. Gilliar, D.O., Plaintiff was informed that, the Board has determined that you are guilty of violating the NYIT Colelge of Osteopathic Medicine Code of Conduct for Academic Honesty.

The Board is imposing the penalty of suspension for a period of at least six months as defined in the 2012-2013 Student Handbook as:

> **Suspension**- Suspension from academic enrollment and revocation of other privileges or activities and from the privilege to enter on the campus premises of related facilities for a period of time not to exceed two years. Criteria for return if appropriate will be specifically outlined in writing. Suspension becomes part of the student's permanent record.
> The potential return from the suspension is contingent upon a complete review of evaluations of your fourth year clerkships and a psychiatric evaluation performed by a physician chosen by the College.

7

37. Defendant had no legitimate basis for conditioning his return from a suspension on the results of a psychiatric evaluation.

38. By letter dated June 3, 2013, again from Dean Gilliar, Plaintiff was informed that the above conditions for possible return from a suspension outlined in the May 22, 2013 were contingent "upon a complete review of evaluations of your fourth year clerkships." The letter states that it was "determined that you have failed *MTIM 808, Clinical Clerkship: Geriatric Medicine, MTSU 818, Clinical Clerkship: Trauma Surgery and MTIM 809, Clinical Clerkhsip: Hematology/Oncology*." As a result, Plaintiff was "dismissed from NYIT College Osteopathic Medicine.

39. According to the June 3, 2013 letter Plaintiff had the right, "to petition to be reinstated to repeat the current curriculum, on academic probation, as a member of the following year's class," by writing a letter to the Dean of Student Affairs and meeting with the Student Progress Committee.

40. Plaintiff met with the Student Progress Committee on June 13, 2013, and Dean Gillar issued a letter on June 14, 2013 stating,

> Following your meeting with the Student Progress Committee on June 13, 2013 the committee is requiring a psychiatric assessment at the Zucker Center before rendering their decision on your petition to return and repeat the fourth year. I concur with their decision.

41. Defendants' improperly based Plaintiff's Petition for Reinstatement on Plaintiff's mental health. In particular, the first questions posed by the Student Progress Committee on June 13, 2013, were those which probed Plaintiff's mental health situation. In particular, at the start of each committee meeting Atzinger would make everyone present aware of Plaintiff's

8

medical history and that he was treating with Dr. Belkin.

42. At this June 13th meeting, Dean Portanova compared Plaintiff to an old car, asking him, "would you really want to ride in it if its just going to break down. I wouldn't get back in it if it had already broken down once." This comment was directly referencing Plaintiff's disability.

43. At this June 13th meeting, when Plaintiff stated that he at times experienced anxiety, he had matured in medical school, to which a faculty member on the committee stated to the others that, "he came out of the closet late," specifically referencing Plaintiff's sexual orientation.

44. Plaintiff again met with the Student Progress Committee on August 15, 2013, and thereafter had a personal meeting with Dean Gilliar on August 27, 2013.

45. By letter dated August 28, 2013 Plaintiff was dismissed from the program by Dean Gilliar, who stated,

> After our meeting on August 27, 2013 and a careful review of your academic progress including consideration of the personal circumstances that may have contributed to your poor performance, I am upholding the recommendation of the Student Progress Committee that you be dismissed without the opportunity for re-instatement to repeat the year. I wish you well in your future endeavors.

46. Plaintiff duly appealed the decision of Dean Gilliar, to Ronald Portanova, Ph. D., Associate Dean, Academic Affairs Division, by letter dated April 2, 2014. Plaintiff's appeal was denied.

47. Plaintiff's termination by NYIT was discriminatory and retaliatory based on his disability, perceived disability, gender (sexual orientation) and complaints of discrimination (retaliation).

48. Plaintiff was told by a Dean at NYIT that Plaintiff would not learn from any mistakes in his

9

fourth year because Plaintiff was, "sick with something more difficult to live with than cancer." Plaintiff was also informed that the Deans, when speaking about Plaintiff, referred to him as a "bum," in reference to what they perceived to be a mental issues constituting a disability.

49. Additionally, during the process to seek reinstatement, Plaintiff was asked by Dean Gregory Saggio, "would you want yourself treating your own mother if she had a brain tumor," and then immediately asked Plaintiff what medications he was taking by stating, "what are you on?" Both were made in reference to Plaintiff's disability and perceived disability. Additionally, Dean Saggio asked Plaintiff if he ever stops taking medication or if he will ever be able to stop." Plaintiff assured him that Plaintiff's disability and any medication he took had no effect on his rotation failures.

## AS AND FOR A FIRST CLAIM FOR RELIEF-ADA

50. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

51. Plaintiff is an protected individual within the meaning of the Americans with Disabilities Act 42 U.S.C. 12182.

52. Plaintiff has a disability within the meaning of the ADA.

53. Defendant DOE is a statutory party within the meaning of the ADA.

54. Defendant violated the ADA by subjecting Plaintiff to disparate treatment, a hostile work environment, and discriminatory treatment due to her disability and perceived disability.

55. As a result of the willful activities of defendant, plaintiff has been deprived of equal employment opportunities based upon her disability, and perceived disability discrimination

10

in violation of the Americans with Disabilities Act 42 U.S.C. 12182.

## AS AND FOR A SECOND CLAIM FOR RELIEF-
## TITLE IX- DISCRIMINATION

56. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

57. NYIT receives federal financial assistance from the United States government.

58. Plaintiff experienced harassment because of his sex that was so severe, pervasive and objectively offensive that it deprived him of access to the educational opportunities and benefits provided by NYIT.

59. The harassment Plaintiff experienced occurred in a context that was subject to NYIT's control and were NYIT could have taken remedial action.

60. NYIT had actual knowledge of the harassment Plaintiff experienced.

61. NYIT's response to the harassment Plaintiff experiences, as alleged herein, was clearly unreasonable in light of the known circumstances, and, thus was deliberately indifferent.

62. As a direct and proximate result of NYIT's indifferent response to the harassment Plaintiff experienced, Plaintiff was deprived of the education opportunities to which he was entitled to as a NYIT student and suffered, and continues to suffer, severe and significant mental anguish and emotional distress.

## AS AND FOR A THIRD CLAIM FOR RELIEF-
## TITLE IX- RETALIATION

63. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

64. NYIT receives federal financial assistance from the United States government.

65. Plaintiff experienced harassment because of his sex that was so severe, pervasive and objectively offensive that it deprived him of access to the educational opportunities and benefits provided by NYIT.

66. Plaintiff complained of the discrimination and harassment suffered and was thereafter retaliated against.

67. As a direct and proximate result of NYIT's retaliation to Plaintiff's complaints of discrimination, Plaintiff was deprived of the education opportunities to which he was entitled to as a NYIT student and suffered, and continues to suffer, severe and significant mental anguish and emotional distress.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS-NYS EXECUTIVE LAW

68. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

69. As a result of the foregoing, defendant violated Executive Law § 296 by subjecting plaintiff to a discrimination (hostile environment and disparate treatment) based on his disability, perceived disability and gender (sexual preference). As a result of defendant violating the Executive Law plaintiff has been damaged.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
### -NYS EXECUTIVE LAW-RETALIATON

70. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

71. As a result of the foregoing, defendant violated Executive Law § 296 by subjecting plaintiff

(hostile environment and disparate treatment) to retaliation. As a result of defendants violating the Executive Law, plaintiff has been damaged.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury of all issues and claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. Compensatory damages including but reimbursement for tuition paid and related expenses and emotional distress;

2. Reinstatement to the medical school;

3. Damages to Plaintiff's reputation;

4. Other damages including damages for a lost career as a physician, including the salary he would have earned if Plaintiff was conferred a degree and damages caused due to the loss of continuity in learning due to the inappropriate dismissal;

5. Attorney fees and costs, cannot yet be determined.

Dated: New York, New York
September 14, 2016

STEWART LEE KARLIN
LAW GROUP, P.C.

  s/ Daniel E. Dugan
STEWART LEE KARLIN, ESQ.
DANIEL E. DUGAN, ESQ.
*Attorney for Plaintiff*
111 John St., 22nd Floor
New York, NY 10038
(212) 792-9670

13